E. MARTIN ESTRADA
United States Attorney
MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division
MATTHEW W. O'BRIEN (Cal. Bar No. 261568)
Assistant United States Attorney
Environmental Crimes and Consumer Protection Section
BRIAN R. FAERSTEIN (Cal. Bar No. 274850)
Assistant United States Attorney
Public Corruption and Civil Rights Section
JUAN M. RODRIGUEZ (Cal. Bar No. 313284)
Assistant United States Attorney
Environmental Crimes and Consumer Protection Section
    1300 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-8644
    Facsimile: (213) 894-0141
    E-mail:    Matthew.O'Brien@usdoj.gov
               Brian.Faerstein@usdoj.gov
               Juan.Rodriguez@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 22-597(A)-RGK |
|---|---|
| Plaintiff, | GOVERNMENT'S SENTENCING MEMORANDUM AND OBJECTIONS TO PRESENTENCE REPORT REGARDING DEFENDANT JOSE MANUEL PEREZ; EXHIBITS |
| v. | |
| JOSE MANUEL PEREZ, aka "Julio Rodriguez," | Hearing Date: November 27, 2023 Hearing Time: 10:00 a.m. Location:    Courtroom of the Hon. R. Gary Klausner |
| Defendant. | |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Matthew W. O'Brien, Brian R. Faerstein, and Juan M. Rodriguez, hereby files its Sentencing Memorandum and Objections to the Presentence Investigation Report Regarding Defendant JOSE MANUEL PEREZ.

This submission is based upon the attached memorandum of points and authorities and the exhibits thereto, the Presentence Investigation Report disclosed on August 28, 2023, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated:   November 13, 2023       Respectfully submitted,

                                 E. MARTIN ESTRADA
                                 United States Attorney

                                 MACK E. JENKINS
                                 Assistant United States Attorney
                                 Chief, Criminal Division


                                      /s/
                                 _____
                                 MATTHEW W. O'BRIEN
                                 BRIAN R. FAERSTEIN
                                 JUAN M. RODRIGUEZ
                                 Assistant United States Attorneys

                                 Attorneys for Plaintiff
                                 UNITED STATES OF AMERICA

# TABLE OF CONTENTS

DESCRIPTION                                                                PAGE

I.    INTRODUCTION.................................................1

II.   STATEMENT OF FACTS...........................................2

III.  THE PSR AND THE GOVERNMENT'S OBJECTIONS......................3

      A.    The Base Offense Level Should Be 26....................3

            1.    Defendant Possessed a Semiautomatic Firearm
                  Capable of Accepting a Large Capacity Magazine.......3

            2.    Defendant Has Two Felony Convictions for a Crime
                  of Violence.........................................4

      B.    A Two-Level Enhancement Should Apply for Obstruction
            of Justice............................................6

IV.   THE GOVERNMENT'S SENTENCING RECOMMENDATION...................9

      A.    The Sentencing Enhancements...........................10

            1.    Multiple Firearms................................11

            2.    Transporting a Firearm from the United States to
                  Mexico...........................................11

      B.    Defendant's "Acceptance of Responsibility".............15

      C.    The Nature and Circumstances of the Offense............16

      D.    Defendant's History and Characteristics................17

            1.    Defendant's Assaults With a Deadly Weapon..........17

            2.    Defendant's Life As a Fugitive in Missouri.........18

            3.    Defendant's Other Violent Episodes................19

            4.    Defendant's Drug Use.............................19

            5.    Defendant's Flight to Mexico While on Pretrial
                  Release Last Year................................20

            6.    Defendant's Attacks on the Prosecution Team........21

      E.    The Section 3553(a)(2) Factors........................22

      F.    The Need to Minimize Sentencing Disparities............22

V.    CONCLUSION..................................................23

**TABLE OF AUTHORITIES**

DESCRIPTION                                                           PAGE

**Federal Cases**

Kisor v. Wilkie,
  139 S. Ct. 2400 (2019) .............................................. 5
United States v. Banks-Giombetti,
  245 F.3d 949 (7th Cir. 2001) ...................................... 16
United States v. Cain,
  806 F. App'x 505 (9th Cir. 2020) ................................. 10
United States v. Castillo,
  69 F.4th 648 (9th Cir. 2023) .................................... 5, 6
United States v. Hill,
  953 F.2d 452 (9th Cir. 1991) ................................. 16, 17
United States v. Johnson,
  920 F.3d 628 (9th Cir. 2019) ...................................... 4
United States v. Rios,
  893 F.2d 479 (2d Cir. 1990) ...................................... 16
United States v. Vasquez-Gonzalez,
  901 F.3d 1060 (9th Cir. 2018) ..................................... 4
United States v. Werle,
  No. 2:14-CR-041-JLQ, 2016 WL 4205354 (E.D. Wash. Aug. 8, 2016) ... 9
United States v. Wills,
  881 F.2d 823 (9th Cir. 1989) .................................... 10

**Statutes**

18 U.S.C. § 922(g)(1)............................................... 22
Cal. Penal Code § 245(a)(1)................................... 4, 5, 6

**<u>MEMORANDUM OF POINTS AND AUTHORITIES</u>**

## I.   INTRODUCTION

Defendant JOSE MANUEL PEREZ ("defendant") is a violent member of the Colonia Chiques gang in Oxnard.  In late 2021 and early 2022, defendant was out of prison for one of the few periods in the past decade.  Rather than find a real job, defendant ran a smuggling conspiracy in which he smuggled thousands of reptiles into the United States from Mexico and then sold them to buyers around the country.  On his return trips to Mexico, he would smuggle guns into Mexico to trade for additional reptiles.[1]

Defendant loved his guns.  He loved taking photos of guns on his iPhone, sending the photos to his friends, and boasting about his guns.  After the government searched defendant's iPhone pursuant to a search warrant, agents found hundreds of photos and videos showing defendant holding his guns.  After a grand jury indicted defendant on three counts of being a felon-in-possession of firearm, defendant insisted on going to trial.  On the second day of trial, after the jury had seen most of the government's evidence, defendant belatedly pled guilty.

Defendant is the rare criminal with a lengthy, wide-ranging rap sheet yet absolutely no mitigating circumstances.  He has a well-documented pattern of recidivism.  (He ran the smuggling conspiracy for many years from <u>inside</u> prison.)  He has twice chosen to leave his family behind to live as a fugitive, including when he spent three years living in Missouri under the fictitious identity "Julio

---

[1] Defendant pled guilty to the wildlife smuggling scheme in August 2022 and will be sentenced in that case on February 15, 2024. (<u>See</u> <u>United States v. Perez</u>, 22-CR-57(A)-FMO.)

Rodriguez."  In the smuggling case, after the Honorable Fernando M. Olguin overruled a Magistrate Judge and released defendant from pretrial detention, defendant cut off his Court-ordered ankle monitor and fled to Mexico, leaving his four small children behind.  And despite his children, when defendant has been out of custody, he lived a hard-partying, cocaine-fueled lifestyle as a gang member.  In short, defendant has no respect for the law, judges, prosecutors, his Court-appointed lawyers, and even his own family.

In this case, the United States Probation Office ("USPO") determined that defendant has a Criminal History Category of IV and a Total Offense Level of 26, resulting in a Guidelines Range of 92 to 115 months.  The government respectfully disagrees with the USPO's Guidelines calculation.  As set forth below, the government believes defendant's Total Offense Level is 32, resulting in a Guidelines range of 168-210 months.

For the reasons set forth below, the government recommends a sentence of 168 months.  Defendant is a violent criminal in need of a lengthy sentence to protect the public and deter his future criminality.

## II.  STATEMENT OF FACTS

The relevant facts are summarized in the PSR.  The government provides additional factual details below in the discussion of the applicable enhancements under the Sentencing Guidelines.

//

//

//

## III. THE PSR AND THE GOVERNMENT'S OBJECTIONS

The PSR calculated defendant's total offense level as follows:

| | | |
|---|---|---|
| Base Offense Level: | U.S.S.G. § 2K2.1(a)(3) | 22 |
| Enhancements: | | |
| • Multiple firearms (between 3 and 7) | U.S.S.G. § 2K2.1(b)(1) | +2 |
| • Transporting firearm from the United States to Mexico | U.S.S.G. § 2K2.1(b)(6)(A) | +4 |
| Acceptance of Responsibility | U.S.S.G. § 3E1.1 | -2 |
| **Total Offense Level:** | | **26** |

(PSR ¶¶ 17-34.)

The USPO determined that defendant falls within Criminal History Category IV. (Id. ¶ 49.) The government agrees. Accordingly, the USPO calculated that defendant's Guidelines range is 92 to 115 months. (Id. ¶ 97.)

The government respectfully has the following objections to the PSR:

### A.   The Base Offense Level Should Be 26

Section 2K2.1(a)(1) provides for a Based Offense Level of 26 where:

> (A) The offense involved a (i) semiautomatic firearm that is capable of accepting a large capacity magazine . . .; and (B) the defendant committed any part of the instant offense subsequent to sustaining at least two felony convictions or either a crime of violence or a controlled substance offense.

U.S.S.G. § 2K2.1(a)(1). Here the government can satisfy both requirements of Section 2K2.1(a)(1).

### 1.   Defendant Possessed a Semiautomatic Firearm Capable of Accepting a Large Capacity Magazine

The Springfield Armory, model XD-9, 9mm Luger caliber pistol that defendant possessed (Count Three in First Superseding

3

Indictment) is a "semiautomatic firearm that is capable of accepting a large capacity magazine." Id. The magazine that defendant possessed for the Springfield Armory held 16 rounds of ammunition, and hence meets the Guidelines' definition of a "large capacity magazine" because "it could accept more than 15 rounds of ammunition." (PSR ¶ 12, 23; see also Exh. A (ATF report showing that the Springfield Armory handgun was semiautomatic and held 16 rounds of ammunition).)

### 2. Defendant Has Two Felony Convictions for a Crime of Violence

Defendant possessed all three firearms charged in the indictment after sustaining at least two felony convictions for a "crime of violence." U.S.S.G. § 2K2.1(a)(1)(B). Specifically, the two convictions were for violations of California Penal Code Section 245(a)(1) in Ventura County Superior Court, Case Number 2011032647 (Counts Two and Three), on July 11, 2012. (PSR ¶ 44; see also Dkt. No. 20 (First Superseding Indictment), at 2:9-18, 3:17-26, 4:17-5:5 (detailing defendant's Assault With a Deadly Weapon convictions).) Defendant was resentenced on both counts on October 21, 2019. (PSR ¶ 44.)

Assault with a deadly weapon in violation of California Penal Code Section 245(a)(1) is a "crime of violence." See, e.g., United States v. Johnson, 920 F.3d 628 (9th Cir. 2019) (California assault by non-firearm deadly weapon, Cal. Penal Code § 245(a)(1), is a "wobbler" offense which may be a misdemeanor or a felony; the court permissibly relied on the statement in the undisputed PSR that the defendant was convicted of a felony and therefore the crime qualified under the Guidelines as a crime of violence); United States v.

4

1  Vasquez–Gonzalez, 901 F.3d 1060 (9th Cir. 2018) (the California
2  offense of assault with a deadly weapon or instrument or by force
3  likely to produce great bodily injury, Cal. Penal Code § 245(a)(1)
4  (pre-2011 amendment), is a crime of violence under the § 16(a)
5  elements clause).

6      Prior to last year, the two felony convictions would not have
7  both counted as two felony convictions due to Application Note 10
8  under Section 2K2.1.  Application Note 10 limited the meaning of "two
9  felony convictions" in Section 2K2.1(a)(1)(B) to "only those
10  convictions that are counted separately under § 4A1.1(a), (b), or
11  (c). See §4A,1,2(a)(2)."  U.S.S.G. § 2K2.1 (cmt. 10).  Two felony
12  convictions that arose out of the same arrest and were imposed on the
13  same date - and thus would not count as separate sentences under
14  Section 4A1.2(a)(2)) - did not count as "two felony convictions"
15  under Section 2K2.1(a)(1)(B).  This made no sense, since the express
16  wording of "two felony convictions" under Section 2K2.1(a)(1)(B) was
17  unambiguous and should not have been subject to an Application Note
18  that changed the meaning of Section 2K2.1(a)(1)(B).

19      Two recent decisions from the Supreme Court and the Ninth
20  Circuit fixed this anomaly.  Under Kisor v. Wilkie, 139 S. Ct. 2400,
21  2414 (2019), and United States v. Castillo, 69 F.4th 648, 655 (9th
22  Cir. 2023), where a Sentencing Guideline is unambiguous – as Section
23  2K2.1(a)(1) is – the Application Notes to Guidelines are no longer
24  entitled to any weight.

25      In Kisor, the Supreme Court clarified that the possibility of
26  deference to an agency's interpretation of its own rules "can arise
27  only if a regulation is genuinely ambiguous."  Kisor, 139 S. Ct. at
28  2414, 2418 (emphasis added).  In Castillo, the Ninth Circuit ruled

1  that, in light of Kisor, Application Notes to the Guidelines are

2  inapplicable when the relevant Guidelines section is unambiguous.

3  Castillo, 69 F.4th at 655-660.  Castillo held that, because Section

4  4B1.2(b) unambiguously defines "controlled substance offense" as not

5  including inchoate offenses, the accompanying Application Note 1

6  (which expands the definition to include inchoate crimes) was

7  entitled to no deference in interpreting Section 4B1.2.  Id.

8      The same holds true here.  Section 2K2.1(a)(1) unambiguously

9  provides for a base offense level of 26 where a defendant has "two

10  felony convictions for either a crime of violence or a controlled

11  substance offense."  Defendant has "two felony convictions" for

12  "crimes of violence."  (PSR ¶ 44; see also Dkt. No. 20 (First

13  Superseding Indictment), at 2:9-18, 3:17-26, 4:17-5:5 (detailing

14  defendant's Assault with a Deadly Weapon convictions).)  Application

15  Note 10 to Section 2K2.1, which limited the eligible prior felony

16  convictions to "only those felony convictions that are counted

17  separately under §4A1.1(a), (b), or (c)," is no longer entitled to

18  any deference.

19      Accordingly, defendant's two convictions for violations of

20  California Penal Code Section 245(a)(1) in Ventura County Superior

21  Court, Case Number 2011032647, on July 11, 2012 both count as "crimes

22  of violence" under Section 2K2.1(a)(1)(B).  As a result, defendant's

23  base offense level should be 26.

**B.   A Two-Level Enhancement Should Apply for Obstruction of Justice**

A two-level enhancement should apply pursuant to Section 3C1.1

because, while defendant was detained at MDC-LA awaiting trial, he

intentionally concealed a tattoo of the cursive letter "A" that he

6

had on his left ring finger.  He did so to destroy evidence.  As defendant was well aware, the "A" tattoo was visible in many of his selfies showing him holding the charged firearms.  (See, e.g., Exh. A at 4.)  While awaiting trial at MDC-LA, defendant got a new tattoo to cover up the "A" tattoo, so that at trial it would look like someone other than defendant was holding the firearms in the photographs and videos.

Defendant had his initial appearance in this case on January 17, 2023.  At the hearing, the Court appointed an attorney to represent defendant.  Within a few days, the government informed the attorney that the government would be filing an ex parte application with the Court seeking a court order authorizing agents to take photographs of defendant's "A" tattoo on his left ring finger.  (At the time, the government lacked a high-quality photo showing both the "A" tattoo and defendant's face.)  On January 26, 2023, the government provided the ex parte application to defendant's attorney, who said she would oppose the request.

On February 3, 2023, the government sent defendant's attorney a lengthy letter detailing, inter alia, the evidentiary significance of the "A" tattoo.  (See Exh. B at 6 of 10.)  On February 10, 2023, the Court signed the order granting the agents permission to take photographs of the "A" tattoo.  (See Exh. C (Dkt. No. 19).)  When ATF agents went to MDC-LA on February 27, 2023 to take the Court-ordered photographs, defendant no longer had the "A" tattoo; he had a new tattoo in the exact same location on his left ring finger.  (See Exh. D (Trial Exh. 405).)  Defendant had gotten a fellow inmate at MDC-LA to color in the "A" tattoo so that it now appeared to be an inverted heart.  (See id.)  Defendant's obstructive conduct significantly

complicated the government's case, since the "A" tattoo visible in many of the government's trial exhibits no longer existed.

To overcome defendant's destruction of evidence, the government obtained the body-cam footage from an Arizona state trooper who had arrested defendant during a traffic stop in September 2022.[2]  The body-cam footage confirmed that, as of September 2022, defendant still had the "A" tattoo – prior to the government informing the defense that it would be seeking a court order to photograph defendant's finger.  (See Exh E (Trial Exh. 408).)

While the government cannot prove exactly when defendant changed his tattoo, it is highly likely that he did so in February 2023, upon being notified by his attorney that the government had obtained this Court's order to obtain better photographs of the "A" tattoo as part of trial preparation.  As defendant knew, the trial would depend on the government's ability to prove that the hands seen in defendant's numerous selfies belonged to him.  A key component of the government's evidence was the "A" tattoo visible on many of the selfies in which defendant possessed firearms.  As a result, defendant got a new tattoo to cover up the "A."

"Conceal[ing] evidence that is material to an official investigation or judicial proceeding...or attempting to do so" is obstructive conduct covered by Section 3C1.1.  Accordingly, defendant's concealment of the "A" tattoo qualifies for the enhancement.

---

[2] On August 31, 2022, while detained prior to sentencing in the smuggling case, defendant was inadvertently released from custody as a result of a Court error involving a material witness warrant being vacated in that case.  Defendant was apprehended the following week while driving through Arizona.

1   The PSR acknowledges the foregoing but concludes that "there
2   appears to be insufficient information at this time" to determine if
3   the enhancement applies.  (PSR ¶ 30.)  The government respectfully
4   disagrees.  Defendant destroyed key evidence in advance of his trial.
5   His spoliation required the government to adjust its trial
6   preparation by making the Arizona traffic stop (which proved that
7   defendant still had the "A" tattoo as of September 2022) part of its
8   case in chief.  But for the body cam footage from the Arizona traffic
9   stop (which defendant did not know existed when he destroyed his
10  tattoo), the government likely would have been unable to prove beyond
11  a reasonable doubt that the "A" tattoo belonged to defendant, and
12  hence that it was defendant holding the guns in many of his selfies.
13  Because defendant refused to plead guilty, the government had to
14  subpoena an Arizona State Trooper and fly him to Los Angeles to
15  testify at defendant's trial about the traffic stop.  This easily
16  meets the materiality standard for the enhancement to apply.  See
17  U.S.S.G. § 3C1.1 App. Note 4(D); PSR ¶ 29.

18  **IV.  THE GOVERNMENT'S SENTENCING RECOMMENDATION**

19  The government respectfully recommends a sentence of 168 months'
20  imprisonment, followed by three years of supervised release with the
21  conditions recommended by the USPO.

22  While the government recognizes that each of the three counts
23  has a statutory maximum sentence of 10 years (PSR ¶ 96), here the
24  imposition of consecutive sentences is warranted "[i]n order to
25  achieve a sentence within the Guideline range" and in light of the
26  Section 3553(a) factors.  United States v. Werle, No. 2:14-CR-041-
27  JLQ, 2016 WL 4205354, at *5 (E.D. Wash. Aug. 8, 2016), aff'd, 877

28

F.3d 879 (9th Cir. 2017), and aff'd, 706 F. App'x 397 (9th Cir. 2017) (imposing consecutive sentences in Section 922(g)(1) case).[3]

The Court "has discretion to impose a concurrent or consecutive sentence, as a matter of law." United States v. Wills, 881 F.2d 823, 826 (9th Cir. 1989) (citing 18 U.S.C. § 3584). "[I]n determining whether the terms imposed are to be ordered to run concurrently or consecutively, the court shall consider, as to each offense for which a term of imprisonment is being imposed, the factors set forth in [Section] 3553(a)." United States v. Cain, 806 F. App'x 505, 508 (9th Cir. 2020) (citing 18 U.S.C. § 3584) (quotations omitted).

The government recommends the imposition of consecutive sentences here in recognition of defendant's Guidelines range and the Section 3553(a) factors.

### A.   The Sentencing Enhancements

Other than as set forth above, the government agrees with the Guidelines calculations in the PSR. Accordingly, in the government's view, the correct Guidelines are as follows:

| | | |
|---|---|---|
| Base Offense Level: | U.S.S.G. § 2K2.1(a)(1) | 26 |
| Enhancements: | | |
| • Multiple firearms (between 3 and 7) | U.S.S.G. § 2K2.1(b)(1) | +2 |
| • Transporting firearm from the United States to Mexico | U.S.S.G. § 2K2.1(b)(6)(A) | +4 |
| • Obstruction of Justice | U.S.S.G. § 3C1.1 | +2 |
| Acceptance of Responsibility | U.S.S.G. § 3E1.1 | −2 |
| **Total Offense Level:** | | **32** |

---

[3] The statutory maximum for Section 922(g)(1) violations is now 15 years, but that change did not take effect until after defendant's possession of the firearms in late 2021 and early 2022.

10

For the Court's benefit, and in case defendant objects to the enhancements recommended in the PSR, the government provides a more detailed explanation below.

### 1. Multiple Firearms

At the change of plea hearing, defendant admitted to possessing three firearms: the Smith & Wesson handgun charged in Count One, the Kimber handgun charged in Count Two, and the Springfield Armory handgun charged in Count Three. Accordingly, a two-level enhancement is necessary pursuant to Section 2K2.1(b)(1). (PSR ¶ 24.) To be clear – defendant possessed more than these three firearms. However, because the enhancement requires only three firearms, the government will not detail the additional firearms here.

### 2. Transporting a Firearm from the United States to Mexico

A four-level enhancement is warranted pursuant to Section 2K2.1(b)(6)(A) because defendant transported at least one firearm from the United States to Mexico. (PSR ¶¶ 10, 19, 25.) Specifically, in the fall of 2021, defendant transported the Smith & Wesson charged in Count One from Ventura to Tijuana, Mexico.

#### a. Defendant's Possession of the Smith & Wesson in Ventura in August, September, and October 2021

Defendant possessed the Smith & Wesson in Ventura from August 2021 (at the latest) through October 2021. On August 12, 2021, Chris Perez (defendant's younger brother) asked defendant to send him a photograph of defendant's "strap" (slang for a handgun). Defendant sent a photo of the Smith & Wesson, with a backdrop of a forklift. (See Exh. F (Trial Exhibit 101).) As USFWS Special Agent Jared Eatmon testified at trial, this forklift was at a property on Palma Drive in Ventura that defendant referred to as the "ranch" or "yard,"

and which he rented to store his reptiles.  Chris Perez asked if the gun was a "9 or 45" and defendant responded, "9."  (<u>See</u> Exh. G (Trial Exhibit 302).)  The Smith & Wesson is a 9-millimeter caliber firearm.

On September 18, 2021, defendant sent his friend "Toledo" (Gustavo Eduardo Toledo Albarran, a notorious smuggler based in Mexico City) a video of defendant holding the same Smith & Wesson and talking about the gun in Spanish.  Defendant said, in part, "It's a 39.  Model 39-2."  (<u>See</u> Exh. H (screenshots from the video, which was Trial Exhibit 104).)  As Special Agent Eatmon testified at trial, the video was taken inside the trailer that defendant kept at the "yard" he rented in Ventura.

On September 21, 2021, defendant sent Toledo a similar video showing defendant holding the Smith & Wesson, including close-ups of the gun in which you can see its serial number.  Defendant again narrated the video in Spanish, describing the gun as a Smith & Wesson and saying, "It's dirty because I just have it here, I hid it and it's getting moldy, I had it under the trailer."  As Special Agent Eatmon testified at trial, this video also was taken inside defendant's trailer in Ventura.  (<u>See</u> Exh. I (screenshots from the video, which was Trial Exhibit 105).)

On October 24, 2021, defendant took another photo (<u>see</u> Exh. J) of the same Smith & Wesson.  The background of the photo shows a group of stacked, white aquariums.  As Special Agent Eatmon testified at trial, defendant took this photo inside a Conex shipping container at the same "yard" in Ventura where he stored his reptiles.  (<u>See</u> <u>also</u> Exh. K (Trial Exhibit 159, a photo of the same white aquariums inside the same shipping container).)

1

                         *b.   Defendant's Possession of the Same Smith & Wesson*
2
                               *in Mexico in November and December 2021*

3
On November 14, 2021, defendant was in Mexico.  In an audio
4
message at 4:38 p.m., he asked his friend "Bugs" if "Trigger" had
5
anything for sale because defendant "left my shit under, underneath
6
the car and look how rusted it got."  (See Exh. L; the audio message
7
was Trial Exhibit 166).)  Defendant then sent "Bugs" a video showing
8
defendant holding the same Smith & Wesson.  Defendant again narrated
9
the video (this time in English) and said, "[I]t looks like it's a
10
World War fucking One gun and shit from the revolution or something."
11
(See Exh. M (screenshots from the video, which was Trial Exhibit
12
108).)  A granite countertop is visible in the background.
13
A few minutes later, "Bugs," via audio message, told defendant
14
to put down the rusted firearm and said that if defendant needed a
15
firearm, "Bugs" could provide one.  (The audio message was Trial
16
Exhibit 167.)  Defendant, in an audio message at 5:23 p.m., said the
17
gun (i.e., the Smith & Wesson) had looked brand new but he had left
18
it outside.  Defendant said it looked "like a pirate gun now but it
19
still claps" (i.e., shoots).  (This audio recording was Trial Exhibit
20
168.)  A minute later, at 5:24 p.m., "Bugs" asked defendant if he was
21
in Tijuana.  Defendant replied that he was in Tijuana.  (See Exh. N
22
at 5 of 5.)
23
On November 15, 2021, defendant made two videos which he sent to
24
his friend "D30."  In the first video, made at 10:33 p.m., defendant
25
examined reptiles (stored in small green mesh bags tied with ribbons)
26
on a white tabletop and said in Spanish (roughly), "I'm still here in
27
Tijuana."  At the end of the video, the same Smith & Wesson is
28

visible, along with its magazine.  (See Exh. O (screenshots from the video, which was Trial Exhibit 110).)

In the second video, which defendant made two minutes later and again narrated, defendant picked up the Smith & Wesson and said, in Spanish, "I was going to give this to you, I was going to gift it to you, fool, because I like you."  (See Exh. P (screenshots of the video, which was trial Exhibit 111).)  The background is the same granite countertop visible in Exhibit M (Trial Exhibit 108), discussed above.  On the countertop, one can see a rusty magazine (that appears to be full of bullets), a few Mexican bills, a dollar bill, and what appears to be cocaine.  Given that the granite countertop is in Tijuana, and that defendant filmed the videos within two minutes of each other, the white tabletop must be in the same location in Tijuana as the granite countertop.  Both the granite countertop and the white tabletop likely are inside the apartment that defendant rented in Tijuana.

On December 5, 2021, defendant sent Toledo another video in which defendant is holding the rusted Smith & Wesson and sitting in the front passenger seat of a vehicle.  (See Exh. Q (screenshots of Trial Exhibit 121).)  Defendant's left thumb has a large bandage on it, exactly where defendant injured his left thumb on November 30, 2021 (as confirmed by numerous additional selfies, see, e.g., Exh. R (Trial Exhibits 113 & 114).)

On December 6, 2021, defendant made another video showing the same white tabletop with containers holding lizards or snakes.  (See Exh. S (a screenshot from Trial Exhibit 122).)  The same Smith & Wesson is on the table.  Defendant also narrated this video and said, "Guns all over.  Drugs, guns."  Defendant sent a very similar photo

to Toledo, along with a text message saying (in Spanish) that he was going to leave the gun with Toledo but that a relative had asked for it.

On December 25, 2021, defendant made another video of himself holding the same Smith & Wesson and a magazine and talking about the gun in Spanish.  (See Exh. T (screenshots from Trial Exhibit 125).) The video shows the same white tabletop as in the other videos. There are a few shells next to the gun.  Defendant said, "It friggin' got mildewed, but it still shoots. . .  The fog came in and it fucked stuff up, but I like it better than the others."  Defendant's wounded left thumb is visible.  Defendant sent the video to "D30" that day.

In sum, between October 24, 2021 and November 14, 2021, defendant transported the Smith & Wesson from Ventura to his residence in Tijuana.  He either kept the Smith & Wesson in Tijuana from November 14, 2021 through December 25, 2021, or brought it with him during his frequent border crossings.[4]  As the PSR found, the four-level enhancement pursuant applies because defendant "possessed [the Smith & Wesson] while leaving or attempting to leave the United States," or (before he left Ventura with the Smith & Wesson) he "possessed or transferred [the Smith & Wesson] with knowledge, intent, or reason to believe that it would be transported out of the United States."  U.S.S.G. § 2K1.1(6)(A).

## B.   Defendant's "Acceptance of Responsibility"

Defendant waited until the middle of the trial to plead guilty. By that time, law enforcement witnesses had flown to Los Angeles from

---

[4] See, e.g., Exh. U (Trial Exhibit 313 (defendant telling his friend Destiny, on December 21, 2021, "Get some rest I wanted to pick up the strap [i.e., gun] about to head to TJ [i.e., Tijuana] in a bit.")).

Missouri, Iowa, Florida, and Arizona to testify at the trial.  The government had submitted all of its pre-trial briefings, and prepared hundreds of trial exhibits.  The jury had been empaneled, the government had made its opening statement, and two witnesses had already testified.  Defendant's belated plea did not save the government from <u>any</u> of its trial preparation.

While the government reluctantly acknowledges that a two-level decrease is warranted in light of defendant's plea during the middle of trial (PSR ¶ 33), the government seeks to emphasize that this is absurd.  Courts in most federal circuits would never consider such an untimely plea as deserving a decrease under Section 3E1.1.  <u>See,</u> <u>e.g.</u>, <u>United States v. Banks-Giombetti</u>, 245 F.3d 949, 954 (7th Cir. 2001) (last-minute guilty pleas rarely demonstrate acceptance of responsibility); <u>United States v. Rios</u>, 893 F.2d 479, 481 (2d Cir. 1990) (affirming the district court's denial of a two-level reduction for acceptance of responsibility "upon appellant's delay in taking a plea until just before jury selection").

Nonetheless, the government recognizes that in the Ninth Circuit, the two-level reduction is liberally applied.  <u>See,</u> <u>e.g.</u>, <u>United States v. Hill</u>, 953 F.2d 452, 461 (9th Cir. 1991) (two-level reduction appropriate even where it is expressed at the eleventh hour).  Accordingly, although the government considers defendant's mid-trial plea to have occurred too late to justify the reduction, the government acknowledges that the Ninth Circuit likely would disagree, and the government recommends the two-level decrease.

**C.   The Nature and Circumstances of the Offense**

The nature and circumstances of the offense are serious. Defendant was a convicted felon and gang member with a violent past,

yet he acquired and flaunted numerous firearms.  He knew he could not legally possess his firearms.  But he possessed multiple firearms, some of which he trafficked to Mexico.  At the same time, he was routinely using cocaine and running a multi-national smuggling operation.

While the government does not have any evidence that defendant ever shot anyone with his illegal firearms, that does not lessen the seriousness of the offense.  The crime, as defendant knew, was possession of the guns, not the use of the guns.  He flouted the law (yet again) and deserves a harsh punishment.

**D.   Defendant's History and Characteristics**

Defendant's personal history is aggravating, to an extraordinary degree.  Despite defendant's relatively normal upbringing (PSR ¶¶ 58-65), he chose to become a member of the Colonia Chiques gang (PSR ¶ 44) and then pursued a lifetime of crime.  (PSR ¶¶ 38-56.) Defendant's portrayal of himself as a stable family man is laughable.

1.   Defendant's Assaults With a Deadly Weapon

Defendant's most violent criminal conduct was when he ran over two innocent victims with his car, repeatedly, during a gang fight in September 2011.  (PSR ¶ 44.)  The PSR summarizes the violence of the incident.  (Id.)  As a result of the attack, defendant pled guilty to two felonies for Assault With a Deadly Weapon and another for Street Terrorism.  (Id.)  Perhaps because he was only 19 years old, defendant got a break and was sentenced to only 180 days jail and 60 months' probation.  (Id.)  In July 2013, while he was still on probation, defendant was arrested for being a felon in possession of ammunition in Ventura County.  (PSR ¶ 45.)

17

### 2.   <u>Defendant's Life As a Fugitive in Missouri</u>

The PSR notes that defendant "spent four years in Saint Charles, Missouri" but does not address the fact that defendant was living in Missouri <u>as a fugitive</u>.  (<u>Id.</u> ¶ 66.)  Rather than face the felon-in-possession charge in Ventura County (<u>id.</u> ¶ 45) and the revocation of his probation in the ADW case (<u>id.</u> ¶ 44), defendant <u>fled</u> to Missouri. The Ventura County Superior Court issued an arrest warrant for defendant for his failure to appear.  (<u>See</u> Exh. V at 1 & 3 of 7.)  To evade the California warrant, defendant assumed the alias "Julio Rodriguez" in Missouri.  (<u>See</u> <u>id.</u> at 3 of 7.)  In July 2014, defendant obtained a genuine Missouri driver's license with his own photograph but the name of "Julio Rodriguez."  (<u>See</u> <u>id.</u> at 3 & 7 of 7.)  He also opened at least one bank account in the name of "Julio Rodriguez," and was employed under that name at a car wash.  (<u>See</u> <u>id.</u> at 3 of 7.)  And defendant began his wildlife-trafficking scheme, operating under the name "Julio Rodriguez," in order to conceal his participation in the unlawful scheme.  (<u>See</u> 22-CR-57(A)-FMO, Dkt. No. 103 at 9:26-27 (defendant admitting in his plea agreement in the smuggling case that "[d]efendant used an alias, 'Julio Rodriguez,' in order to conceal his participation in the unlawful scheme").)

Defendant's life as a fugitive succeeded until August 25, 2016, when he was arrested in Missouri for being a fugitive from California.  (PSR ¶ 55.)  Defendant lied to the USPO when he claimed that his job in Missouri "ended when he was arrested for robbery" (<u>id.</u> ¶ 85); he was arrested in Missouri for being a fugitive (<u>id.</u> ¶ 55).  On September 4, 2016, defendant was extradited to California to face the pending charges.  (<u>See</u> Exh. V at 3 of 7.)  He continued the smuggling scheme from inside the Ventura County Jail.  (<u>See</u> 22-CR-

57(A)-FMO, Dkt. No. 103 at 15:20-22 (defendant admitting in his plea agreement in the smuggling case that he ran the scheme from inside the Ventura County Jail, and how, "[i]n one of the first calls from jail, defendant told [his sister], 'The business is running smooth. I can run the business from in here.'").)

### 3.   Defendant's Other Violent Episodes

Defendant assaulted his sister, L.P., on June 8, 2021.  (PSR ¶ 50.)  Defendant entered their parents' house and said to L.P., "Fuck you, fat bitch," and then threw a candle and glass container at L.P., causing a gash on her arm.  (Id.)  According to the police report, L.P.'s nine-year old daughter (defendant's niece) witnessed the assault, and told police, "I don't like it when he hits my mom." L.P. told police that she would seek a restraining order against defendant.  (Id.)  According to the police report, L.P. did not want to press charges against defendant because her parents disapproved.

The PSR has additional references to defendant's violent lifestyle.  The PSR recounts that in 2018, defendant was "hit in the head with a crowbar."  (Id. ¶ 70.)  The PSR further recounts:

> In addition, he reports having scars on his back and thighs
> from stab wounds suffered in 2019 after he was "jumped" due
> to "baby mama drama."  He stated he was hospitalized for
> two to three days from this incident.

(Id.)

### 4.   Defendant's Drug Use

Defendant was high on cocaine when he committed the Assaults with a Deadly Weapon in 2011.  (PSR ¶ 44.)  While such drug use might be viewed as unfortunate but forgivable conduct given that defendant was only 19 years old at the time, defendant has done nothing to curtail his drug use since then.  When agents searched defendant's

iPhone in 2022, they found a trove of evidence confirming defendant's cocaine use in 2021 and 2022.  (See, e.g., Exhs. W, X, Y, Z.)  Defendant's self-portrayal of himself as a family man cannot be reconciled with his chronic, frequent, and long-term drug use, not to mention his violence toward close family members (PSR ¶ 50) and strangers (PSR ¶ 44).

Defendant told the USPO that "[h]is last use of alcohol or controlled substances was on August 1, 2021."  (Id. ¶ 75.)  That was a lie.  The videos and photos seized from defendant's phone prove that defendant routinely was using cocaine from August 2021 through February 2022 (when he was arrested in the wildlife-smuggling case).  (See, e.g., Exhs. W, X, Y, Z.)  Defendant's willingness to lie to the Court on this collateral issue – after his purported acceptance of responsibility – speaks volumes.

Making matters worse, defendant recently attempted to smuggle methamphetamines into MDC-LA.  On October 12, 2023, MDC-LA officials confiscated an envelope, addressed to defendant, whose contents tested positive for methamphetamines.  (See Exh. CC.)

   5. <u>Defendant's Flight to Mexico While on Pretrial Release Last Year</u>

After defendant was indicted in the smuggling case, he spent months trying to persuade Magistrate Judge Oliver and Judge Olguin to reduce his bond so that he could be released from custody.  Again portraying himself as a law-abiding family man whose focus was his young children, defendant eventually succeeded in persuading Judge Olguin to release him from custody in May 2022.

Defendant fled to Mexico almost immediately.  As defendant admitted in his plea agreement in the smuggling case:

> On or about June 5, 2022, without the Court's permission,
> defendant removed the ankle bracelet used for Court-ordered
> location monitoring and fled to Tijuana, Mexico.  On June
> 6, 2022, defendant failed to appear at a 3:00 p.m. hearing
> that he had requested regarding his representation in this
> matter.  On June 16, 2022, law enforcement officials
> apprehended defendant in Mexico.

(22-CR-57(A)-FMO, Dkt. No. 103 at 19:3-12.)  As with his flight to

Missouri as a fugitive in 2013, defendant did not return to

California voluntarily; he was apprehended by Mexican authorities and

returned to federal custody.  Defendant's father had posted a $5,000

secured bond to facilitate his son's release; defendant responded to

his father's generosity by promptly cutting off his GPS ankle monitor

and fleeing the country.

> 6.    Defendant's Attacks on the Prosecution Team

Defendant's belated acceptance of responsibility should also be

measured against his public behavior.  After the Court released

defendant from MDC in May 2022 (but before he fled to Mexico),

defendant began using social media to cast aspersions at and

essentially taunt the government while he remained on bond.  On May

17, 2022, for example, defendant posted the following on Facebook:

> Going up against the feds. I'll be making my case public so
> everyone can see how low they stoop and the lies they try
> and use to scare people. I'm all about my reptiles and will
> stand up for them. Exercising my freedom of speech right[.]
> Fuck The Feds.

(Exh. AA.)  That same day, defendant posted the following on

Facebook:

> I will post the rest of the evidence I got against the
> feds. Lol if I get taken back into custody it's because
> they want me to shut up but once again they fuck with my
> family and let my animals die it's on fuck the feds… Feds
> don't play right they will commit perjury and lie with out
> caring about anything. Whatever it takes to win their case.

(Exh. BB.)

On May 23, 2022, defendant went so far as to email one of the undersigned prosecutors directly, with a thinly veiled threat:  "I will do the most to fight my case if I have too [sic] and I won't stop at nothing."

**E.   The Section 3553(a)(2) Factors**

Pursuant to Section 3553(a)(2), the recommended sentence would reflect the seriousness of the offenses, promote respect for the law, provide just punishment for the offenses, afford adequate deterrence to criminal conduct, and protect the public from further crimes by defendant.

This is perhaps the rare case in which every one of the factors set forth in Section 3553(a)(2) is implicated.  The offense is serious.  Defendant has no respect for the law, as he showed most recently by trying to smuggle methamphetamines into MCD-LA a few weeks ago.  He is badly in need of a just punishment and deterrence. And the public must be protected from defendant, a lifelong – and dangerous - criminal.

**F.   The Need to Minimize Sentencing Disparities**

Section 3553(a)(6) requires the Court to minimize sentencing disparities among similarly situated defendants.  A sentence within the Guidelines would not cause any such disparities.  While a sentence of 168 months is higher than many sentences in felon-in-possession cases, defendant's unique and egregious conduct, combined with his criminal history, render him uniquely situated.  For the same reason, the government believes consecutive sentences are warranted here due to the 10-year statutory maximum in 18 U.S.C. § 922(g)(1) that applies to defendant's crimes.  (Subsequent to his

crimes, Congress raised the statutory maximum for a Section 922(g)(1) violation to 15 years.)

**V.      CONCLUSION**

For the foregoing reasons, the government respectfully requests that this Court sentence defendant to 168 months in prison, followed by three years of supervised release with the conditions recommended by the USPO.